The TOWNSHIP OF SPRINGFIELD; Parkland Preservation Fund, a New Jersey non-profit corporation; and Watchung Nature Club, a New Jersey non-profit corporation, Appellants,

v.

Drew LEWIS, individually and as the present Secretary of the United States Department of Transportation; the United States Department of Transportation; Ray Barnhart, individually and as the present Federal Highway Administrator; the Federal Highway Administration; John G. Bestgen, Jr., individually and as the present Regional Administrator of Region One of the Federal Highway Administration; John S. Kessler, Jr., individually and as the Division Administrator of the New Jersey Division of the Federal Highway Administration; Louis J. Gambaccini, individually and as the Commissioner of Transportation of the New Jersey Department of Transportation; and the New Jersey Department of Transportation, Appellees.

No. 82–5445.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1982.

Decided March 15, 1983.

As Amended March 22, 1983.

David Sive (argued), Robert C. Barrett, Winer, Neuburger & Sive, New York City, for appellants.

W. Hunt Dumont, U.S. Atty., Mary Catherine Cuff, Asst. U.S. Atty. (argued), Newark, N.J., for federal appellees.

Irwin I. Kimmelman, Atty. Gen. of N.J., James J. Ciancia, Asst. Atty. Gen., Trenton, N.J., of counsel; John J. Maiorana (argued), Howard B. Epstein, Deputy Attys. Gen., Trenton, N.J., on brief for state appellees.

Before WEIS and BECKER, Circuit Judges, and VAN DUSEN, Senior Circuit Judge.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case involves a challenge by environmental groups and local governmental units to the construction of a 5½ mile long, six-lane, high-speed segment of Interstate Route 78 ("I–78"), a federally financed highway scheduled to run through a 2,000-acre New Jersey park known as the Watchung Reservation. Plaintiff-appellants are the Township of Springfield, the Parkland Preservation Fund, and the Watchung Nature Club. Defendant-appellees are Drew Lewis, Secretary of the United States Department of Transportation ("USDOT"); USDOT; Ray Barnhart, Administrator of the Federal Highway Administration ("FHWA"); FHWA; John G. Bestgen, Jr., Regional Administrator of Region One of FHWA; John S. Kessler, Jr., Division Administrator of the New Jersey Division of FHWA; Louis J. Gambaccini, Commissioner of Transportation of the New Jersey Department of Transportation ("NJDOT"); and NJDOT. Appellants sued for declaratory and injunctive relief to compel appellees to stop work on the proposed highway until they held additional hearings and prepared additional reports allegedly required by federal and state law. The District Court for the District of New Jersey, in four written but unpublished opinions, granted summary judgment for appellees on all nine claims of the complaint.

The case requires us to construe and apply three federal statutes: the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370 (1976 & Supp. IV 1980); the Department of Transportation Act of 1966 ("DOTA"), 49 U.S.C. §§ 1651–1659 (1976 & Supp. IV 1980); and the Federal-Aid Highway Act ("FAHA"), 23 U.S.C. §§ 101–156 (1976 & Supp. V 1981). We also must construe and apply

the New Jersey Relocation Assistance Programs Act, N.J.Stat.Ann. §§ 27:7–66 to –68 (West 1982); the New Jersey Environmental Rights Act ("ERA"), N.J.Stat.Ann. §§ 2A:35A–1 to –14 (West 1982); and the New Jersey Action Plan ("Action Plan"), adopted pursuant to FAHA by FHWA and NJDOT. Appellants claim that appellees have violated each of these statutes and that the district court erred in not ruling, *inter alia,* (a) that appellees should have supplemented or redrafted the federally mandated Environmental Impact Statement ("EIS"); (b) that appellees should have held new public hearings before deciding upon the location of, and even the desirability of constructing, the highway;[1] (c) that appellees gave inadequate consideration to the environmental impact of and alternatives to the proposed roadway; and (d) that appellees improperly approved the advance acquisition of a quarry adjacent to the site of the future highway without holding public hearings or waiting for the EIS to be approved.

For the reasons that follow, we conclude that: (a) appellees were not required to redraft or supplement the EIS; (b) they were not required to hold additional location hearings; (c) they adequately evaluated alternatives to the proposed highway as well as that roadway's effect on the environment; and (d) they lack standing to sue to enforce the "advance acquisition" regulations governing the purchase of the quarry. We therefore will affirm in full the judgment of the district court.

Because of the complexity of the statutes and regulations involved in the case, we will begin our discussion with a survey of the three principal statutes at issue: NEPA, FAHA, and DOTA. Against this statutory background, we then will develop the extensive factual and procedural history of this litigation. Our discussion of the merits of appellants' numerous claims will follow. While we will accord some of those claims summary treatment, we will consider sever-

---

1. The location of the highway initially was approved in 1959, prior to the enactment of NEPA, DOTA, and FAHA. New public hear-

ings on the project took place in the summer of 1976.

al of them—those dealing with redrafting the EIS, holding further hearings, evaluating alternatives to the proposal, and purchasing the quarry—at length because of the significance of the issues and the importance to the litigants of this highway project.

I. *Statutory Background*

A. *NEPA*

NEPA represents the culmination of legislative efforts to

declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321 (1976). The Act mandates that this environmental policy animate "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," [2] *id.* § 4332(2)(C), and provides that the "responsible official" in charge of each such major action must file a "detailed statement" (the EIS) discussing

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.* The responsible federal official must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved" and must make available the EIS and the related comments thereon to the President, the Council on Environmental Quality ("CEQ"), and the public.[3] *Id.* The official also must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources...." *Id.* § 4332(2)(E).

The goal of NEPA, therefore, is "to control the more destructive effects of man's technology on his environment...." *Pennsylvania Environmental Council, Inc. v. Bartlett,* 454 F.2d 613, 624 (3d Cir.1971). The EIS is the device that promotes the fulfillment of the statutory objective.

B. *DOTA*

Section 4(f) of DOTA decrees:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal,

**2.** Appellees do not deny that the building of I–78 through the Watchung Reservation would constitute a "major Federal action ... significantly affecting the quality of the human environment...."

**3.** The EIS and comments "shall accompany the proposal through the existing agency review processes...." *Id.*

State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

49 U.S.C. § 1653(f) (1976). Thus was engendered the "section-4(f) statement," which usually accompanies the EIS and demonstrates that the Secretary has made the two determinations set out in the statute. The Secretary's scrutiny must not be cursory, for DOTA's compass is broad:

> Congress articulated in § 4(f) a disparate weighting against the use of parkland for highway projects. It said, don't use greenlands, but if you must do so, be practical and cut harm to the minimum. It did so in recognition of the fact that it is always easier to build highways through publicly owned parks because people and their homes, businesses, schools and churches will not have to be displaced and its acquisition costs little or

nothing. This thumb-on-the-scale approach is required whenever the parkland is to be used. If courts were to interpret this section to permit an initial appraisal of whether the use was substantial, it would infuse consideration of elements (such as the degree of harm to the park, animal life, environment, etc.) which Congress did not want considered when it said, if there is another way, take it. *Any park use, regardless of its degree, invokes § 4(f).*

*Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 84 (5th Cir.1976) (emphasis added).

### C. FAHA

FAHA establishes rules and standards to which federal and state officials must adhere before a highway may be planned and constructed with 90-percent federal funds as a part of the federal Interstate System.[4] The Act reiterates the environmental concerns expressed in DOTA,[5] *supra,* and provides that

> (a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing

---

**4.** The Fourth Circuit has summarized the procedural path set forth in FAHA:

> First, a route must be selected by the highway department of a state and approved by the Secretary of Transportation. 23 U.S.C.A. § 103(d) & (e)(1). Next, the state highway department must submit to the Secretary for his approval a "program ... of proposed projects" that the state wishes to construct with its portion of the funds appropriated for highway construction. 23 U.S.C.A. § 105(a). Then, the state highway department must submit to the Secretary for approval "such surveys, plans, specifications, and estimates for each proposed project included in an approved program as the Secretary may require." 23 U.S.C.A. § 106(a). This is known as "P.S. & E. approval." As a prerequisite to P.S. & E. approval for each "project," the state highway department must certify to the Secretary that it has held public hearings on the location for each project and must submit a transcript of the hearings to the Secretary. 23 U.S.C.A. § 128. Following P.S. & E. approval, project agreements covering construction and maintenance are entered into between the Secretary and the state highway department. 23 U.S.C.A. § 110. Advertisements for bids may then be published and

construction contracts awarded. Finally the highway is constructed under the supervision of the state highway department. 23 U.S. C.A. §§ 112, 114.

*Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1328 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). For an extensive discussion of FAHA and of FHWA operations, see Mashaw, *The Legal Structure of Frustration: Alternative Strategies for Public Choice Concerning Federally Aided Highway Construction,* 122 U.Pa.L.Rev. 1 (1973).

**5.** The language of § 138 of FAHA is virtually identical to § 4(f) of DOTA, 49 U.S.C. § 1653(f), *supra,* but contains an extra sentence:

> In carrying out the national policy declared in this section the Secretary, in cooperation with the Secretary of the Interior and appropriate State and local officials, is authorized to conduct studies as to the most feasible Federal-aid routes for the movement of motor vehicular traffic through or around national parks so as to best serve the needs of the traveling public while preserving the natural beauty of these areas.

23 U.S.C. § 138 (1976).

of or, going through any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed locations of such highway. Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental and other effects of the plan or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered.

(b) When hearings have been held under subsection (a), the State highway department shall submit a copy of the transcript of said hearings to the Secretary, together with the certification and report.

23 U.S.C. § 128 (1976).[6] These public hearings are of two types:

> Both a *corridor public hearing* and a *design public hearing* must be held, or an opportunity afforded for those hearings, with respect to each Federal-aid highway project that:
>
> (1) Is on a new location; or
>
> (2) Would have a substantially different social, economic, or environmental effect; or
>
> (3) Would essentially change the layout or function of connecting roads or streets.

23 C.F.R. § 790.5(a) (1980) (emphasis added).[7]

Considered together, NEPA, DOTA, and FAHA thus require a complex of reports and studies—including an EIS, a section-4(f) statement, and public hearings—before a federally financed highway such as I–78 can be built. Against this statutory and regulatory background, we now may consider the facts of the case before us.

## II. *Factual and Procedural Background*

I–78 roughly parallels or replaces Route U.S. 22 and extends from the Holland Tunnel, in New York City, to Interstate Route

**6.** As originally enacted in 1958, § 128(a) required that only the *economic* effects of the proposed highway be considered at the hearing. Act of Aug. 27, 1958, Pub.L. No. 85–767, 72 Stat. 902. An amendment in 1968 added social and environmental impacts and consistency with local urban planning to the list of effects to be evaluated. Act of Aug. 23, 1968, Pub.L. No. 90–495, § 24, 82 Stat. 828. Section 128(a) was further amended in 1970 to require the state to file with the Secretary a report revealing the consideration accorded to economic, social, environmental and other effects of the proposed project. Act of Dec. 31, 1970, Pub.L. No. 91–605, Tit. I, § 135, 84 Stat. 1734. *See Lathan v. Brinegar,* 506 F.2d 677, 682–85 (9th Cir.1974) (discussing evolution and requirements of FAHA).

**7.** A "corridor [or location] public hearing" is held "before the route location is approved and before the State highway department is committed to a specific proposal." 23 C.F.R. § 790.3(a)(1) (1980). The purpose of the hearing is "to ensure that an opportunity is afforded for effective participation by interested per-

sons in the process of determining the need for, and the location of, a Federal-aid highway" and to provide "a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic, and environmental effects of those alternate locations." 23 C.F.R. § 790.3(a)(2)–(3) (1980).

A "design public hearing" is held "after the route location has been approved, but before the State highway department is committed to a specific design proposal." 23 C.F.R. § 790.3(b)(1) (1980). This hearing is meant "to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway" and to provide "a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs." 23 C.F.R. § 790.3(b)(2)–(3) (1980).

81, near Harrisburg, Pennsylvania, a distance of approximately 160 miles. Except for the area upon which we shall focus and a proposed 36-mile section bypassing Phillipsburg, New Jersey, and Allentown, Bethlehem, and Easton, Pennsylvania, I–78 has been completed and is open to traffic.

The subject of this case is a 5½ mile gap (the "Watchung Gap") in the New Jersey stretch of I–78 between the Township of Berkeley Heights and the Borough of Watchung, on the west, and the Township of Springfield, on the east.[8] The Final Environmental Impact Statement ("FEIS") characterizes the area as

> suburban residential, with several large campus type industrial establishments interspersed among well defined neighborhoods. Notable among the land uses within this area are: the Bell Telephone Laboratories, the John E. Runnells Hospital, the Governor Livingston Regional High School and the Watchung Reservation, a 2,000 + -acre public park operated by the County of Union Department of Parks and Recreation.

2 FEIS at I–A–2.

The planning of I–78 began in 1956, when Congress enacted legislation providing for an interstate system of highways. Detailed location studies for the section from Newark to Annandale, New Jersey, (including the Watchung Gap) commenced in 1958, and the authorities involved presented the selected location (the "original alignment") at a public hearing held on June 30, 1958. 2 FEIS at I–B–2 to –4. On January 23, 1959, NJDOT wrote to the Bureau of Public Roads (now the FHWA) and requested its "concurrence and approval in the alignment as presented at the hearing." Letter from James J. Malloy to H.P. Beschenbossel (Jan. 23, 1959) (requesting location approval),

App. at A556. The Bureau approved the original alignment on February 11, 1959, and instructed NJDOT to proceed with detailed design plans. Letter from H.P. Beschenbossel to J.J. Malloy (Feb. 11, 1959) (granting location approval), App. at A634. NJDOT received final Plan, Specifications and Estimate approval of its design and contract plans in December 1965 and March 1966, and NJDOT then completed the acquisition or condemnation of all of the highway's right-of-way except for that land located within the Watchung Reservation. 2 FEIS at I–B–1. NJDOT "invested several years in negotiating with the Union County Park Commission [hereinafter the "Park Commission"] in an attempt to acquire the Watchung Reservation [right-of-way]." *Id.*

In July 1970, however, the project snagged: the Bureau of Public Roads rescinded its design approval because of lapse of time and because "significant design revisions required as a result of meetings with the ... Park Commission." *Id.* An agreement between NJDOT and the Park Commission was not executed until April 10, 1972, by which time FHWA policy mandated that an EIS be prepared for any highway section " 'which receives or received design approval ... on or after February 1, 1971.' " *Id.* (quoting FHWA Policy and Procedure Memorandum 90–1, Transmittal 202, Aug. 24, 1971). Moreover, FHWA determined that NJDOT would also have to file a section-4(f) statement, as section 4(f) of DOTA had been enacted prior to the rescission of design approval. *Id.*

NJDOT submitted its first Draft Environmental Impact Statement ("DEIS") and section-4(f) statement[9] to the CEQ and circulated it to the public in November 1973. Ensuing comments and technological changes revealed the need for further

---

**8.** To be more precise: "[t]he principal corridor of analysis is that bounded by Route U.S. 22 on the south, Plainfield Avenue and Bonnie Burn Road on the west, Mountain Avenue on the north, and Summit (Baltusrol) Road on the east." 2 Final Environmental Impact Statement at I–A–1. The corridor is located within the City of Summit, the Townships of Berkeley Heights, Scotch Plains, and Springfield, and the

Boroughs of Mountainside, New Providence, and Watchung; all of the above, with the exception of the Borough of Watchung, are parts of Union County. *Id.*

**9.** The term "FEIS" or "DEIS" henceforth shall comprehend both the environmental impact statement mandated by NEPA and the section-4(f) statement required by DOTA.

study, and a new DEIS was distributed on May 17, 1976. *Id.*

The 1976 DEIS studied the impact of the proposed highway segment on traffic, air quality, noise, water quality, flooding, and "socio-economics." Also featured were analyses of nine principal alternatives, including a "no-build" alternative, as well as a series of design modifications introduced to mitigate adverse environmental impacts. 2 FEIS at I–B–5 to –7.

NJDOT held public hearings on the project from June 27 through July 1, 1976, and continued to receive written comments for the official record until November 1, 1976. 2 FEIS at I–A–2. NJDOT then began to prepare the FEIS and included therein updated studies relating to air quality, noise, ecosystems, industrial impact, traffic, and engineering. *Id.* at I–B–7 to –8.

The period from January 1977 through August 1978 saw a steady stream of letters between NJDOT and FHWA, with NJDOT submitting further studies and revising the EIS in response to information or changes requested by FHWA. App. at A557–83. On September 25, 1978, NJDOT submitted copies of the FEIS to FHWA and requested "early approval to print." Letter from F. Howard Zahn to John J. Kessler, Jr. (Sept. 25, 1978) (requesting approval to print FEIS), App. at A584. FHWA was not yet satisfied, however, and further comments and revisions flowed between the parties.[10] App. at A585–626. FHWA granted conditional approval to print the FEIS, Letter from John J. Kessler, Jr., to J.F. Andrews (April 15, 1980) (conditioning approval upon two revisions), App. at A635, and, on June 2, 1980, NJDOT transmitted to FHWA fourteen copies of the FEIS "for approval and adoption," Letter from F. Howard Zahn to John J. Kessler, Jr. (June 2, 1980) (requesting adoption of FHWA), App. at A105. Final approval was given on Janu-

ary 26, 1981. Letter from John J. Kessler, Jr., to Robert Innocenzi (Jan. 26, 1981) (approving FEIS), App. at A661.

The construction of I–78 through the Watchung Reservation, as approved by FHWA and USDOT, offers a number of benefits: the roadway is expected to improve the flow of vehicular traffic, saving both travel time and fuel; to reduce accident rates; and to lower "total vehicle pollutant emissions" because of smoother traffic flows and reduction in overall vehicle miles travelled. 1 FEIS at S–3 to –4. The adverse impacts, on the other hand, also are significant: the construction and presence of the six-lane highway will intrude upon the natural setting; will require the excavation of approximately 4.4 million cubic yards of rock and earth, mostly within the park; will necessitate the decimation of at least seventy acres of hardwood forest; will destroy animal habitat; will "cause noise in much of the Reservation"; will degrade water quality; will slightly increase flooding possibilities; will require the relocation of a stable; will split the park in two; and will have various impacts outside the Watchung Reservation as well. *Id.* at S-3 to –8.

On January 19, 1981, appellants filed suit in the District Court for the District of New Jersey to enjoin the construction of the disputed segment of I–78 and the advance acquisition of the Houdaille Quarry, an inactive quarry adjacent to the proposed right-of-way intended to become a depository for the earth and rock moved during the construction of the highway. The complaint, as amended and supplemented on March 3, 1981, set forth nine claims:

1. Appellees had violated NEPA by failing and refusing to redraft or supplement and recirculate the 1976 EIS;

2. Appellees had violated the New Jersey Action Plan and ERA by failing

---

**10.** FHWA also received comments from Winer, Neuberger & Sive, the law firm representing appellants. Letter from Robert C. Barrett to John J. Kessler, Jr. (Aug. 13, 1979) (questioning the need for the project and criticizing various aspects thereof), App. at A598–605. FHWA

informed NJDOT of the letter and enumerated those criticisms it deemed significant. Letter from John J. Kessler, Jr., to Russell H. Mullen (Sept. 6, 1979) (commenting on Barrett letter), App. at A597.

and refusing to hold new public hearings on the route's location and to reconsider or modify the project;

3. Appellees had violated NEPA by approving the project on the basis of an EIS that did not adequately discuss alternatives and environmental effects;

4. Appellees had violated section 4332(2)(E) of NEPA by failing properly to study, develop, and describe appropriate alternatives;

5. Appellees had violated section 4 of DOTA by ignoring feasible and prudent alternatives to the use of protected parkland and by failing to minimize harm to such lands;

6. Appellees had violated conditions imposed by USDOT requiring cooperative efforts between NJDOT and various communities affected by the proposed highway;

7. Appellees had violated NEPA, DOTA, 23 C.F.R. § 712.204(d) (1980), ERA, and other regulations in processing the "advance acquisition" of the Houdaille Quarry;

8. Appellees had violated ERA in approving the project; and

9. Appellees had violated FAHA in processing a project that should be removed from the federal interstate system

Complaint at 18–22, App. at A25–29.

On July 6, 1981, appellants moved for partial summary judgment on claims 1, 2, and 7, whereupon appellees cross-moved for summary judgment and also moved for a protective order barring appellants from taking the depositions of state and federal officials, employees, and consultants. The district court denied appellants' motion, granted summary judgment for appellees on claim 7, and granted partial summary judgment for appellees on claims 1 and 2. *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. Aug. 31, 1981) (*"Springfield I"*). The court also granted appellees' motion for a protective order and denied appellants' motion for a preliminary injunction enjoining the acquisition of the Houdaille Quarry.[11] Several months later, the district court granted summary judgment for the state appellees on claims 3, 4, 5, 6, 8, and 9, and summary judgment for all appellees on claim 1, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. Dec. 31, 1981) (*"Springfield II"*). Summary judgment for the federal appellees on claims 3, 4, 5, and 9 followed thereafter. *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. June 29, 1982) (*"Springfield III"*).[12] Finally, after holding evidentiary hearings on the issue of location approval, the court granted summary judgment for appellees on claim 2, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. June 29, 1982) (*"Springfield IV"*), and entered a final order granting summary judgment for appellees on all counts and denying all relief sought by appellants, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. July 19, 1982).[13] This appeal followed.[14]

---

11. Appellants appealed the denial of the preliminary injunction to this Court, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. Aug. 31, 1981) (notice of appeal), and applied for a stay of the district court's order pending disposition of the appeal. A single judge of this Court denied the stay, and appellants subsequently withdrew the notice of appeal without prejudice pending final determination in the district court. *Township of Springfield v. Goldschmidt,* No. 81–2647 (3d Cir. Nov. 3, 1981) (stipulation of withdrawal and voluntary dismissal of appeal without prejudice).

12. Claims 6 and 8 do not apply to the federal appellees.

13. The district court also

1. denied appellants' motion to compel production of documents, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. Jan. 28, 1982) (Transcript of Proceedings);

2. granted appellees' motion to quash appellants' subpoena of certain documents, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. Feb. 17, 1982) (Transcript of Proceedings);

3. denied appellants' motion to stay appellees' "construction activities," including advertisement for bids, award of contracts, and commencement of construction, *Township of Springfield v. Lewis,* No. 81–123 (D.N.J. Aug. 4, 1982). Appellants appealed the denial to this Court; a two-judge panel denied injunctive relief pending appeal. *Township of Springfield v. Goldschmidt,* No. 82–5445 (3d Cir. Sept. 21, 1982) (order denying relief pending appeal but expediting appeal on merits).

14. This Court heard oral argument in this case on Monday, October 18, 1982. At that time,

We now turn to appellants' various legal claims, focusing primarily on claims 1, 2, 3, 4, 5, and 7, which involve the adequacy of the FEIS, the issue of location approval, and the advance acquisition of the Houdaille Quarry. We then will consider in a more summary manner the remaining contentions.

### III. Should the DEIS Have Been Redrafted?

Appellants assert (claim 1) that appellees should have redrafted and recirculated the 1976 DEIS before commencing the project and that the failure to do so violates NEPA and the regulations promulgated thereunder. Central to appellants' arguments is 23 C.F.R. § 771.12(*o*) (1980) (emphasis added), which provides:

> The draft EIS shall, *if necessary,* be revised unless the final EIS is submitted to FHWA for adoption within 3 years from the date the draft EIS was circulated. If the draft EIS is revised, it shall also be recirculated for comment. Such recirculation shall be in the same manner as an original draft EIS.

NJDOT first circulated the DEIS on May 17, 1976; the agency did not request "approval and adoption" of the FEIS until June 2, 1980, *see* Letter from F. Howard Zahn to John J. Kessler, Jr. (June 2, 1980) (transmitting FEIS and requesting approval and adoption), App. at A105. Thus, conclude appellants, more than three years elapsed between the DEIS and the submission for adoption of the FEIS, and a revised DEIS therefore is needed to account for new information and changes in plans. Appellees deny the need to revise the DEIS.

Assuming that appellants are correct in claiming that the FEIS was not "submitted to FHWA for adoption" until June 2, 1980, we still must confront the express language of 23 C.F.R. § 771.12(*o*). We agree with

the district court's reading of the regulation: section 771.12(*o*) would require redrafting and recirculating of the DEIS "only if it is *'necessary,'" Springfield I, supra,* slip. op. at 3 (emphasis added). We therefore must determine the existence *vel non* of such necessity.

Appellants explicate the "if necessary" phrase in section 771.12(*o*) by referring to 23 C.F.R. § 771.14(i) (1980) (emphasis added), which provides that

> [t]he final EIS shall be reevaluated by [NJDOT] and the FHWA prior to proceeding with major project activities for the purpose of determining whether there has been a *substantial change* in the social, economic and environmental effects of the proposed action. If there are *substantial changes in the proposed action that would significantly affect the quality of the human environment,* a supplemental statement shall be prepared,

and 23 C.F.R. § 771.15 (1980) (emphasis added), which instructs that

> [a] draft EIS or final EIS may be supplemented at any time. Supplements will be necessary when *substantial changes* are made in the proposed action that will introduce a new or changed environmental effect *of significance* to the quality of the human environment or *significant new information* becomes available concerning the action's environmental aspects. The decision to prepare and process a supplement to the final EIS shall not void or alter FHWA approval actions given prior to the decision, or void or alter previously authorized development of the highway section not directly affected by the changed condition or new information. A supplement is to be processed in the same manner as a new EIS (draft and final).

Adopting this exegesis of section 771.12(*o*), as did the district court, we will examine (a)

counsel for appellants advised us that construction contracts had been signed on Friday, October 15, 1982, and that workers were prepared to begin cutting down trees at the conclusion of argument before this Court. Appellants there-

fore requested that we stay the construction activities pending disposition of the merits of the case. We denied the relief sought and also denied appellants' motion for reconsideration.

whether there were "substantial changes in the proposed action that would significantly affect the quality of the human environment," and (b) whether "significant new information [became] available concerning the action's environmental aspects."

## A. *Substantial Changes*

Appellants focus on three design changes that were made after the preparation of the DEIS: the elimination of one proposed interchange at Glenside Road, a partial change in the interchange on Diamond Hill Road, and the narrowing of the width of the highway's median strip from 200 feet to 143 feet. The district court ruled that appellees had acted reasonably in deciding not to revise the DEIS on the basis of these changes and granted summary judgment for appellees.

First, the court relied on a letter from FHWA to appellants' attorneys, in which FHWA addressed a host of concerns raised by appellants and expressed its opinion that a new DEIS was unnecessary because "[t]he alignment was not substantially shifted, property taken or seriously harmed was not increased or changed in character, [and] environmental damages were not greater or of a different nature." Letter from John J. Kessler, Jr., to Robert C. Barrett at 2 (Nov. 13, 1980) (responding to Barrett's letter), App. at A631.[15] Second, the court noted that "interchanges are considered 'major design features,' 23 C.F.R. § 795.2 (1980), and are more appropriately addressed at the design stage which follows the adoption of the final EIS by FHWA. . . ." *Springfield I, supra,* slip op. at 7 n. * Third, the court held that "[w]hen changes made between the draft EIS and the final EIS unquestionably mitigate adverse environmental effects of the project, as is the case

here, those changes generally do not require a supplemental EIS." *Id.* at 7.

Before discussing the substance of the district court's decision, we first must consider whether the court applied the correct standard of review. The district court believed its scope of review to be "narrow": "the agency's decision not to supplement the EIS in view of the changes in the project must be upheld if it was reasonable." *Id.* at 7. To support its determination, the court relied on *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 992 (5th Cir.1981); *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir. 1980); and *Green Mountain Grange No. One v. Lewis,* No. 80–265, slip op. at 18 (D.Vt. May 5, 1981), all of which adopted a reasonableness standard.

This Court has reserved decision on the proper standard to apply in reviewing an agency decision not to prepare an EIS at all, *see Township of Lower Alloways Creek v. Public Service Electric & Gas Co.,* 687 F.2d 732, 741–42 (3d Cir.1982); *Concord Township v. United States,* 625 F.2d 1068, 1073–74 (3d Cir.1980); *a fortiori,* we have not prescribed the standard to apply in reviewing a decision not to revise and recirculate an EIS already prepared. As Judge Adams said for the Court in *Township of Lower Alloways Creek:*

> federal courts of appeals have differed as to whether an administrative decision not to prepare an EIS should be measured by the "reasonableness" of that decision under the circumstances, or by the traditional "arbitrary and capricious" standard contained in the Administrative Procedure Act. . . . Judge Gibbons, writing for the Court [in *Concord Township, supra*], found it unnecessary for this Circuit to join either group of opposing ap-

---

**15.** The relevant portion of the letter, as quoted in *Springfield I, supra,* slip op. at 6, reads as follows:

> Within the context of a location or corridor approval, the changes made to the project after the public hearing were not substantial. The alignment was not substantially shifted, property taken or seriously harmed was not increased or changed in character, environmental damages were not great [*sic*] or of a

different nature. Most changes resulted from comments by the public and other agencies and reduced the degree of adverse effects in virtually all cases; we have heard no objections to the proposed changes. There has not been "substantial unidentified development" in affected area nor "significant social, economic or environmental effects not previously considered."

pellate courts. Instead, without deciding whether it was in fact the appropriate judicial standard, he proceeded to apply the "reasonableness" test to the facts of the case for three reasons: first, because that test appeared to be preferred by the district courts under our supervision; second, because there was "much to be said in favor of subjecting these threshold determinations to the higher scrutiny on review," and finally, because the particular agency decision under consideration "pass[ed] muster" even under the "higher" measure of "reasonableness." [625 F.2d] at 1073–74.

687 F.2d at 742 (footnote omitted).[16]

We do not here reach the question reserved in *Township of Lower Alloways Creek* and *Concord Township,* for we will adopt the approach taken in those two cases:

we will assume, without deciding, that an agency's determination not to [revise] an EIS must be "reasonable under the circumstances," *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1320 (8th Cir.1974), when viewed "in the light of the mandatory requirements and high standards set by [NEPA]," *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244, 1249 (10th Cir.1973).

*Township of Lower Alloways Creek, supra,* 687 F.2d at 742.

■ Applying this standard, we agree with the district court that appellees reasonably could have concluded that any changes made in the plans for I–78 since the drafting and circulating of the 1976 DEIS were not substantial enough to necessitate revising and recirculating the DEIS.

As we noted above, appellants complained principally of changes in two interchanges and in the width of the median strip. We agree with the district court that appellants' concerns about the interchanges may be expressed during the course of the design hearings mandated by 23 C.F.R. §§ 790.5 and 790.9, *supra.* Moreover, the elimination of one interchange and the narrowing of median-strip width will mitigate, rather than enhance, I–78's environmental impact. *See* Admin. Record, doc. 60 (reduction of medians will minimize right-of-way and preserve parkland);[17] *id.,* doc. 62 (Township of Berkeley Heights, a plaintiff in the district court proceedings, recommended reducing median). While we sympathize with the contention that "dangers . . . can occur when information appears in the final EIS for the first time," *Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105, 122 (D.N.H.1975),[18] we believe that a

---

**16.** Judge Adams also explained in that opinion the perceived differences between the two standards of review:

It is generally thought that the "reasonableness" standard of review is "far less deferential" to agency decisionmaking than is the "arbitrary and capricious" standard. *See Concord Township, Del. County, Commonwealth of Pa. v. United States,* 625 F.2d 1068, 1073 (3d Cir.1980). In some instances, however, the distinction between the two standards tends to blur. Even under the arguably "lower" standard, agencies are not entitled to unbridled discretion in determining whether preparation of an EIS is necessary. *See, e.g., City of New York v. United States Dep't of Transp.,* 539 F.Supp. 1237, 1261–76 (S.D.N.Y. 1982) (agency's finding that transportation of nuclear waste material through New York City would produce no significant environmental effects was "arbitrary, capricious, and an abuse of discretion," because the agency had paid insufficient attention to risks deriving from human error, sabotage, and mechanical failure, had inadequately assessed the physical and social consequences

accompanying a catastrophic accident, and had failed to explore alternatives to highway transportation).

*Id.* at 742 n. 23.

**17.** Modifications that the I–78 Task Force "agreed upon . . . for further development" included:

1. Lowered Profile
2. Noise Barrier Construction
3. Judicious Landscaping
4. Partial Cut & Cover
5. Minimization of [right-of-way] taking via reduced medians and return of slope easements within the Watchung Reservation to the Union County Park Commission.
6. Possible minor shifts in the Original Alignment, to minimize impact to the Governor Livingston High School, and to facilitate mitigation measures to the Park.

*Id.*

**18.** Judge Bownes identified two such dangers: "(1) the ultimate decision-makers will believe that there is no controversy due to the lack of critical comment; and (2) objective errors

certain degree of judicial flexibility is required where "additional mitigation measures implemented represent essentially a 'specification and modification' . . . of those discussed in the EIS, which 'merely further reduce' [the project's] adverse effects," and where "all of the changes implemented constitute *improvements* in the mitigation techniques involved," *Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 6 (1st Cir.1981). Indeed, "the responsiveness to environmental concerns demonstrated by these changes reflects a commendable effort to comply with the spirit of NEPA. A requirement that a supplemental EIS be prepared each time such improvements were instituted would surely serve as a practical deterrent to just such desirable efforts." *Id. See also New England Coalition on Nuclear Pollution v. United States Nuclear Regulatory Commission,* 582 F.2d 87, 94 (1st Cir.1978).[19]

For these reasons, we conclude that the changes in the project were not substantial enough to require the revision and recirculation of the DEIS.[20] We will affirm the grant of summary judgment on the substantial-changes aspect of claim 1 because appellants have not created a genuine issue of material fact on this point.

### B. *New Information*

Appellants also assert that appellees should have redrafted and recirculated the DEIS because of new information that became available after the document's initial preparation and circulation.[21] Specifically, appellants focus on six studies contained in the FEIS but undertaken after the DEIS had been circulated: (1) an air-quality report, Admin. Record, doc. 71; (2) a noise report, *id.;* (3) an ecosystems report, *id.,* doc. 70; (4) an industrial-impact analysis, *id.,* doc. 76; (5) new traffic studies, *id.,* doc. 59; and (6) new engineering studies, *id.,* doc. 60. Additionally, appellants contend that the EIS ignored the "energy crisis" and its impact on the need for the proposed highway.

Pursuant to instructions from the district court, FHWA and NJDOT submitted a letter addressing each of the points raised by appellants. Letter from John J. Kessler, Jr., and F. Howard Zahn to Hon. Frederick B. Lacey (September 3, 1981) (discussing significance *vel non* of new studies and information), App. at A215. Appellees concluded:

None of the studies provided significant new information within the context of an EIS for a project alignment; none of the information would affect a decision to

without being red-flagged would go unnoticed." *Id.*

19. We are aware of the Fifth Circuit's pronouncement that "merely because some of the [changes] may have been *intended* to 'mitigate environmental impact' does not shield those [changes] from review under NEPA.... The proper question is not the intent behind the actions, but the significance of the new environmental impacts." *Environmental Defense Fund v. Marsh, supra,* 651 F.2d at 993. *Marsh,* however, was a different case: the changes there at issue involved a fifty-percent increase in the land to be used for the proposed project. We are not dealing with changes of a similar magnitude.

20. Appellants claim in their brief that the district court erred in not considering as major changes the removal of the Houdaille Quarry from the tax rolls of Springfield Township and the amounts of earth and rock to be excavated. Brief for Appellants at 43–44. We will consider claims relating to the Houdaille Quarry in our discussion of whether appellees complied

with the provisions of 23 C.F.R. § 712.204(d) (1980), *see infra* Part VI. While it is true that the FEIS discusses excavation activity of a scope far greater than that apparently contemplated in the May 1976 version of the DEIS, *compare* DEIS at III–J–1 *with* 1 FEIS at S–6, the DEIS did discuss other alternatives involving the excavation of up to 4,289,000 cubic yards of "excess" rock and earth. We therefore cannot say that the subject was insufficiently broached therein.

21. When the district court granted partial summary judgment for appellees on the substantial-changes portion of claim 1, it refused to grant summary judgment on the new-information aspect because appellees had not made an express determination that the new information was insignificant. *See Springfield II, supra,* slip op. at 24; *Springfield I, supra,* slip op. at 8. Appellees submitted the requisite determination, and the court ruled on the matter in *Springfield II, supra,* and *Springfield III, supra.*

build or not to build or to select another alignment. The most important of the new information concerns mitigation measures: the noise study identifies benefits which justify the large added construction cost of the lowered profile (a design feature); the wetlands study finds that wetland replacement is feasible. The other studies provided additional information which confirms the DEIS conclusions.

We considered the added studies as a normal response to DEIS and public hearing comments and to develop mitigation measures. New information was not considered significant enough to recirculate as a revised or supplemented DEIS.

*Id.* at 2–3, App. at A216–17.

▇ Upon receipt of this letter, the district court undertook its own careful analysis of each of the seven issues raised by appellants and concluded that appellees reasonably could have found no need to supplement or redraft the DEIS.[22] *Springfield II, supra,* slip op. at 26–33. We agree.

In order for the network of environmental regulations to function effectively and to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans," 42 U.S.C. § 4331(a), federal agencies conscientiously must fulfill their continuing duty to gather, evaluate, and circulate new information relevant to the environmental impact of their proposed actions. *See Warm Springs Dam Task Force v. Gribble, supra,* 621 F.2d at 1023; *Society for Animal Rights, Inc. v. Schlesinger,* 512 F.2d 915, 917–18 (D.C.Cir. 1975); 42 U.S.C. § 4332(2). The "ideal situation," of course, occurs when

all information contained in the Final EIS [has] been circulated in the Draft EIS; however, to require such perfection under NEPA fails to recognize the reality that new and better information may become available. Prohibiting the inclusion of updated information in a Final EIS defeats the purpose behind NEPA of encouraging a full and fair consideration of environmental effects. As the Supreme Court indicated in *Vermont Yankee Nuclear Power Corp.* [*v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 555 [98 S.Ct. 1197, 1217, 55 L.Ed.2d 460] (1978)], and *ICC v. Jersey City,* 322 U.S. 503, 514 [64 S.Ct. 1129, 1134, 88 L.Ed. 1420] . . . (1944), an administrative process can never come to an end if the process must begin again every time new information is available. Inclusion of information in the Final EIS that was not circulated in the Draft EIS does not necessarily violate NEPA.

*Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 442 (5th Cir.1981). *See also Warm Springs Dam Task Force v. Gribble, supra,* 621 F.2d at 1024; *Green Mountain Grange No. One v. Lewis, supra,* slip op. at 17. Accordingly, we must allow involved agencies some leeway to make a reasoned determination that new studies and information do not require revising and recirculating the DEIS; to do otherwise would wreak havoc upon the administrative process and might even discourage vigorous post-DEIS analysis of proposed projects. We have reviewed the seven points raised by appellants, and we are satisfied as to the correctness of the district court's conclusion that FHWA and NJDOT did not exceed the bounds of reasonable discretion.[23]

---

**22.** The court initially expressed its impatience with appellants' strategy and arguments, noting that "[appellants] seek to exalt to a substantive issue what was considered by counsel and the court to be a procedural matter." *Springfield II, supra,* slip op. at 24. In denying appellees' motion for summary judgment on the significant-information aspect of claim 1, see *supra* note 21, the court had made clear its intention to grant that motion as soon as appellees formally determined the new information

to be insignificant. The court viewed appellees' failure to make this determination as a purely procedural irregularity and read claim 1 as alleging merely that appellees had not followed the requisite procedures.

**23.** Because the principal new-information claim related to predictions of traffic levels, appellants also submitted as allegedly significant new information an affidavit of Allan Davis, a professional engineer registered in New Jersey and a Fellow of the Institute of Transportation

### IV. Adequacy of the FEIS

Appellants assert in claims 3, 4, and 5 of their complaint that appellees have violated NEPA and DOTA by processing and approving the I–78 project without adequately examining adverse environmental effects, without studying available alternatives to the proposal, and without taking all possible measures to minimize harm to protected parklands. The district court summarized appellants' major contentions:

(1) the EIS fails to discuss, in good faith, reasonable alternatives, such as the tunnel cut and cover alternatives, making smaller scale improvements to Routes 22, 24 and 28, making improvements in mass transportation, improving Route 22 with a double-decked roadway, designing I–78 with 4 lanes instead of 6, and using different interchange configurations to lessen traffic on local streets; (2) . . . the EIS misrepresents the trend for traffic volumes on I–78; and (3) . . . the EIS misrepresents the mix of trucks projected for I–78.

*Springfield II, supra,* slip op. at 1.

In addition to attacking the adequacy of the EIS, appellants also have introduced the affidavits of their traffic expert, Allan Davis, a registered professional engineer. *See supra* note 23. Davis asserted that

[t]he traffic forecasting methodology [employed in the EIS] is inappropriate, inaccurate and based on false assumptions. The traffic forecasts are grossly inaccurate. These traffic forecasts are the basis for the analysis of air quality and noise impacts, for demonstrating the need for the project, and for the design of the project. The inaccuracy of the traffic forecasting has resulted in errors in all of

those aspects of the FEIS and of the design.

Davis Aff. I, *supra* note 23, at 1, App. at A182. These conclusions advanced by Davis allegedly rested on *actual* traffic counts taken during periods for which, years earlier, appellees had been able to produce only forecasts. Davis thus claimed that reality—and the energy crisis—had proved appellees' predictions incorrect and that traffic in the area actually had decreased, rendering construction of the new highway unnecessary. Davis also argued (apparently in the alternative) that, if the highway were in fact needed, the project nevertheless was so poorly designed that it would "be operating in a 'stop and go' manner within five years of [its] opening . . . ." *Id.* at 3, App. at A184.

The district court carefully scrutinized NJDOT's traffic studies and rejected Davis' contentions that the data therein were derived by inappropriate or inaccurate traffic-forecasting methodologies. *Springfield II, supra,* slip op. at 2–6.[24] The court then undertook an exhaustive, paragraph-by-paragraph dissection of the Davis affidavits, *id.* at 6–16, 33–36, and found in them nothing that impeached the accuracy of traffic forecasts in the EIS.

The district court deemed Davis' figures misleading because Davis was working with road segments different from those that appellees had used in their own studies. The court also found that the segments discussed in the affidavit had been labeled confusingly and that Davis had employed forecasting methods different from those used by appellees. *Springfield II, supra,* slip op. at 9–11. Furthermore, the district court found internal contradictions and inconsistencies in the affidavits. *Id.* at 12–16.

Engineers. Davis Aff. (Oct. 8, 1981), App. at A235 ("Davis Aff. II"). This affidavit supplemented Davis' earlier affidavit, Davis Aff. (July 24, 1981), App. at A182 ("Davis Aff. I"), which had been submitted in connection with appellants' claims 3, 4, and 5. The district court, after dissecting the two affidavits, found them to be merely "vague, unsupported opinion" and held that they failed to "draw any conclusions as to how any of this 'significant new traffic information' affects the I–78 project as a whole

or the alternatives discussed in the draft EIS and final EIS." *Springfield II, supra,* slip op. at 36. The court therefore accorded the affidavits "no weight" with respect to claim 1. *Id.* We agree with the district court's conclusions but will defer consideration of those affidavits until our discussion of claims 3, 4, and 5, immediately below.

24. For further discussion of traffic impacts, see 2 FEIS at III–A–1 to –14.

Finally, the court noted that Davis "does not state that this inaccuracy [in the traffic forecasts] makes I–78 unnecessary, [and] he advances no view as to how such alleged errors would affect the project as it is proposed or the alternatives which were discussed in the final EIS." *Id.* at 13.[25] For these reasons, the court rejected the affidavits as "[c]onsisting largely of unsupported opinion, and embodying, as to a critical portion, internal contradictions," *id.* at 15, and ruled that, "while traffic volumes on Route 22 [a nearby highway] may have decreased somewhat, the traffic projections [in the NJDOT studies] were well within the realm of accuracy and the decreas [sic] was in fact attributable to the opening of I–78," *id.* at 15–16.[26] The court therefore granted summary judgment on claims 3, 4, and 5 for appellees.[27]

We first must determine the appropriate standard of review of appellees' actions. This Court has held that

[t]he review of an agency decision to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement, requires the court to determine whether all necessary procedures were followed, to consider de novo all relevant questions of law, and to examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion.

*Concord Township v. United States, supra,* 625 F.2d at 1073 (footnote omitted). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–824, 28 L.Ed.2d 136 (1971). The reviewing court must adopt that posture because

NEPA, while establishing "significant substantive goals for the Nation," imposes upon agencies duties that are "essentially procedural." ... NEPA was designed "to insure a fully informed and well-considered decision," but not necessarily "a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency." ... [O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

---

**25.** We have quoted from the district court's discussion of Davis Aff. I; the court evaluated Davis Aff. II in a similar manner. *See Springfield II, supra,* slip op. at 35–36.

**26.** Acknowledging that it was operating within the constraints of a summary-judgment context, the district court wrote:

While an expert's report, in affidavit form, may, under certain circumstances, be evidential and sufficient to defeat a motion for summary judgment, *Bieghler v. Kleppe,* 633 F.2d 531 (9th Cir.1980), the Davis Affidavit I does not so qualify here. *See Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1125, 1143–46 (E.D.Pa.1980); *see also County of Suffolk v. Secretary of Interior,* [562 F.2d 1368, 1384–85 (2d Cir.1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978)].

*Id.* at 15.

**27.** The court treated claim 5, the DOTA claim, in a more summary manner, largely because appellants again relied on the Davis affidavits to defeat summary judgment. The judge noted that appellants never had specified the "feasible and prudent" alternatives that allegedly existed, *Springfield II, supra,* slip op. at 16, adding that "Mr. Davis does not ... address [in his affidavits], even in passing, the alternatives which were evaluated in the 4(f) statement of the final EIS," *id.* at 17. The court reminded appellants that Volume IV of the FEIS, the "4(f) statement," did include evaluations of ten alternatives to the proposed highway:

(1) No Build Alternative; (2) Mass Transportation; (3) Well Field Alignment Alternative; (4) Ridge Alignment; (5) Valley Alignment; (6) Tunnel and/or Cut and Cover; (7) Hospital Bypass Alternative; (8) South of the Park Alignment; (9) No Interchange Alignment; and (10) Watchung Reservation Bypass. Admin. Record 58, Final Environmental Impact Statement Vol. IV at IX–8 to IX–17.

*Id.* at 17 n. 8. Finding in appellees' criticisms only blanket condemnation of the whole project, the court granted summary judgment for appellees on claim 5.

*Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)).[28] Accordingly, we must uphold appellees' determination unless we can conclude that appellees failed adequately to follow prescribed procedures or made decisions that were "arbitrary, capricious, and an abuse of discretion." *Concord Township v. United States, supra,* 625 F.2d at 1073.[29] *See also Concerned Citizens on I–190 v. Secretary of Transportation, supra,* 641 F.2d at 7; *Lathan v. Brinegar, supra* note 6, 506 F.2d at 692–93.

■ We cannot so hold, for we find persuasive both the district court's analysis of the studies undertaken by appellees and the conclusion the court reached. The four-volume FEIS itself attests to the attention paid to alternatives and mitigative measures. Moreover, the court's painstaking scrutiny of the Davis affidavits convinces us that we cannot set aside appellees' determinations on the basis of the information contained in Davis' submissions. Because appellants' submissions do not suffice to raise a genuine issue of material fact, we will affirm the grant of summary judgment for appellees on claims 3, 4, and 5.

## V. *The Need for Further Public Hearings*

Appellants next contest (claim 2) the fact that appellees have continued to process the project without holding the additional public hearings allegedly required by federal

---

**28.** *See also Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) ("The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'") (quoting *Natural Resources Defense Council v. Morton,* 458 F.2d 827, 838 (D.C.Cir. 1972)).

**29.** The district court stated in its opinion that a "rule of reason" applies in reviewing the comprehensiveness of an EIS. *See Springfield II, supra,* slip op. at 2. On the surface, this "rule of reason" might seem to clash with *Concord Township's* enunciation of an arbitrary-and-capricious or abuse-of-discretion standard. *Cf. Township of Lower Alloways Creek v. Public Serv. Elec. & Gas Co., supra,* 687 F.2d at 742 n. 23 ("reasonableness" standard generally considered to be " 'far less deferential' " to agency than is "arbitrary and capricious" standard). We note first that, to the extent that application of the "rule of reason" *does* conflict with *Concord Township,* appellants have had the benefit of a standard of review *less* deferential to agency action than that employed in *Concord Township.* We do not believe, however, that the "rule of reason" articulated by the district court necessarily is inconsistent with *Concord Township.*

The Supreme Court has stated that "detailed statement[s] of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., supra,* 435 U.S. at 551 [98 S.Ct. at 1215]. Similarly, the Fourth Circuit has held that,

[s]o long as there are unexplored and undiscussed alternatives that inventive minds can suggest, without a rule of reason, it will be technically impossible to prepare a literally correct environmental impact statement and literally impossible for a state highway department to report ... the final decision on the route of a federal highway to the federal authorities.

*Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027 (4th Cir.), *cert. denied,* 423 U.S. 912 [96 S.Ct. 216, 46 L.Ed.2d 140] (1975). Under this approach, the "rule of reason" is what a court invokes when faced with the contention that the agency never considered certain information or alternatives at all: if the only alternatives not explored are those that it was not rational for the agency to have explored, the agency acted properly. The arbitrary-and-capricious standard, on the other hand, would apply when the court reviews how the agency dealt with the information and alternatives it did consider. Accordingly, under the district court's approach, we can require an agency to consider only what it reasonably should have considered; the consideration it actually accorded is subject to a more deferential standard of review. This result would not appear to conflict with *Concord Township.*

regulations and the Action Plan.[30] 23 C.F.R. § 790.5(e) (1980) provides that, "[i]f location approval is not *requested* within 3 years after [a] related corridor hearing [has been] held, or an opportunity for a hearing afforded, under this part, a *new hearing* must be held or the opportunity afforded for such a hearing" (emphasis added); the Action Plan prepared by appellees similarly declares that "[t]he opportunity for a new hearing will be afforded the public when . . . location approval is not *requested* from the FHWA within three years after the date of the previous hearing or of the opportunity for a hearing afforded," Action Plan at VII–27 (emphasis added).[31]

Appellants advance a two-part argument, corresponding to the two sets of public hearings that have been held during the long life of the I–78 project. The Bureau of Public Roads originally granted location approval to NJDOT in 1959, following public hearings held in 1958. Appellants contend, however, that this approval either lapsed or was implicitly rescinded sometime between 1959 and the 1970's;[32] otherwise, appellants assert, the whole EIS process would be a " 'post hoc rationalization for a decision already made,' " *Springfield I, supra,* slip op. at 10 (quoting appellants). The intervention of NEPA, DOTA, and FAHA, appellants say, required appellees to hold new public hearings and again request loca-

**30.** The Action Plan is a document that "indicate[s] the procedures to be followed in developing highway projects, including organizational structure and assignments of responsibility by the chief administrative officer of the highway agency to positions or units within the agency." 23 C.F.R. § 795.7 (1980). Taking a " 'systematic, interdisciplinary approach,' " *id.* § 795.11, the Action Plan identifies social, economic, and environmental effects of the proposed highway, *id.* § 795.8, and considers alternative courses of action, *id.* § 795.9. Preparation of the Action Plan is mandated by FHWA regulations, which prescribe that "each highway agency shall operate under an approved Action Plan which describes the organization to be utilized and the process to be followed in the development of Federal and Federal-aid highway projects from initial system planning through design." *Id.* § 795.5(a). The regulations contemplate close collaboration between federal and state agencies in developing both the Action Plan and the project itself. *Id.* §§ 795.5–795.6.

**31.** This section of the Action Plan provides, in full:

The opportunity for a new hearing will be afforded the public when:

1. location approval is not requested from the FHWA within three years after the date of the previous hearing or of the opportunity for a hearing afforded,

2. substantial change [is made] in the proposal,

3. · substantial unidentified development in the area affected by the proposal [is discovered], or

4. identification of significant social, economic or environmental effects not previously considered at earlier hearings [is made].

The need for an opportunity for new hearing may be determined within the Department or as a result of community involve-

ment activities. The final evaluation of the warrants and the ultimate decision regarding a new hearing will be made by the Transportation Planning Board.

Action Plan at VII–27. Appellants also rely on 23 C.F.R. § 790.5(g) (1980):

(g) With respect to any project for which a public hearing has been held under Federal-aid procedures, and for which it is determined by the State highway department and the Division Administrator that a new hearing is desirable to consider supplemental information on social, economic, or environmental effects relative to proposals presented at a previous public hearing or with respect to additional proposals, then, as appropriate, a new corridor or design hearing should be held. When recommended by the State and approved by the Division Administrator, a new corridor hearing held in accordance with this section may be combined with the design hearing, whether or not a design hearing for the project has been previously held. In such instances, the location shall be reconsidered and a new request for location approval shall be submitted together with the request for design approval.

We shall not consider further any claims based on 23 C.F.R. § 790.5(g) or those parts of the Action Plan that relate to "substantial changes" in the proposal, to new developments, or to new information. The district court disposed of these contentions by referring to its analysis of claim 1, *Springfield I, supra,* slip op. at 9, and, as our discussion above has revealed, *see supra* Part IV, we agree with the district court's determinations. We therefore shall confine ourselves to considering only the claim that new hearings are needed because of passage of time.

**32.** As we noted above, the Bureau of Public Roads did rescind *design* approval in July 1970.

tion approval within three years of those hearings.

NJDOT did, in fact, hold new hearings from June 27 through July 1, 1976. 2 FEIS at I–A–2. However, NJDOT did not request "approval and adoption" of the FEIS until June 2, 1980, nearly four years later. *See* Letter from F. Howard Zahn to John J. Kessler, Jr. (June 2, 1980) (requesting adoption of FEIS by FHWA), App. at A105. Because NJDOT's request did not come within three years of the hearings, appellants conclude, NJDOT must hold yet another public hearing (or afford an opportunity for one to be held) and again request location approval from FHWA.

Appellees respond with two arguments. First, they assert, the 1959 location approval never was rescinded, and NJDOT is entitled to rely on its initial request for location approval as long as it does not seek to change the alignment of the highway. Second, assuming *arguendo* that the 1959 location approval no longer is valid, appellees contend that they did in fact request location approval before July 1, 1979 (i.e., within three years of the 1976 public hearings). Appellees point to a letter from NJDOT to FHWA, dated September 25, 1978, requesting "early approval to print," [33] and another letter from NJDOT to FHWA, dated March 15, 1979, enclosing the FEIS "for your review and approval." [34] Based on these submissions, appellees argue (1) that they did timely request location

approval even though they did not use the word "adoption," upon which appellants place so much weight, and (2) that, at any rate, they *substantially* complied with the Action Plan and the regulations by sending the above letters to FHWA and thus should not be penalized for omitting the specific words arguably needed to effect a second request for location approval.

Finding a disputed issue of material fact as to "whether location approval, granted in 1959, was rescinded implicitly, and, if so, whether it was subsequently requested within three years from the last public hearing," *Springfield I, supra,* slip op. at 11, the district court initially denied appellees' motion for summary judgment and held two days of evidentiary hearings to resolve these issues. *Springfield IV, supra,* slip op. at 1. Appellee Kessler, of FHWA, testified at the hearings that, at the time of his appointment in 1974, he had not gone through files to determine whether the 1959 approval had been rescinded because everyone at FHWA understood that approval still to be in effect. *Id.* at 2. On behalf of NJDOT, Frank Howard Zahn, Jr., Chief of the Bureau of Environmental Analysis for NJDOT, stated that he never specifically had requested location approval for I–78 because he always believed that such approval had long since been granted. *Id.* at 2–3. The district court credited the testimony of both witnesses. *Id.*[35]

---

**33.** Letter from F. Howard Zahn to John J. Kessler, Jr. (Sept. 25, 1978) (requesting FHWA's approval to print FEIS, which specifies the preferred location selected by NJDOT), App. at A97. The letter reads, in relevant part:

Transmitted herewith for your approval to print are three copies of the I–78 Final EIS and one set of technical support documents. These documents incorporate suggestions made by your office and by this Department.

. . . .

Inasmuch as this Final EIS has been the subject of numerous reviews and rewrites, we would appreciate your early approval to print.

**34.** Letter from F. Howard Zahn to John J. Kessler, Jr. (March 15, 1979) (requesting FHWA approval of FEIS), App. at A98. The letter reads, in relevant part:

The [FEIS] for I–78 Watchung Reservation has been revised in response to your letter of February 22, 1979. Two copies of the document are enclosed for your review and approval.

. . . .

It is our belief that this document is ready for approval. We hope that your review of this last draft will result in the same finding. *But cf.* Letter from F. Howard Zahn to John J. Kessler, Jr. (Feb. 21, 1980) ("Attached for your *pre-printing* review and approval is one copy of the Summary volume [Volume I] for the subject project."), App. at A103 (emphasis added).

**35.** Zahn and Kessler also introduced and identified various documents, some of which already have been discussed above.

Appellants, for their part, neither called any witnesses of their own nor cross-examined any of appellees' witnesses. *Id.* at 3. Nor did they introduce any direct evidence showing a lapse or rescission of the 1959 location approval. Instead, appellants presented circumstantial evidence, relying heavily on transcripts of the 1976 public hearings, during which NJDOT officials represented that the agency was considering nine different locations for the highway, had not yet selected a preferred alternative, and wanted comments from the public before making any decisions.[36] Moreover, appellants stressed that location approval depends upon the *adoption*, not the printing or review, of the FEIS, and NJDOT did not request "adoption" until June 2, 1980, *see supra.* In short, appellants contended that the EIS, the public hearings, and the NJDOT officials' comments at those hearings all constituted an implicit acknowledgement that the 1959 location approval had been rescinded; if not, appellants suggested, appellees either had acted in bad faith or had engaged in a charade.[37]

On June 29, 1982, the district court issued its opinion dealing with the evidentiary hearings held on February 8 and 17, 1982. The court reviewed the parties' contentions and declared it "abundantly plain from the massive Administrative Record that the purposes of these statutory provisions were fulfilled by the public hearings which were held in 1976." *Springfield IV, supra,* slip

---

**36.** Commissioner Alan Sagner spoke at those hearings for NJDOT:

Good evening, ladies and gentlemen. I'm coming before you this evening, the first day of the I–78 Public Hearing, so that I might elaborate on the purpose of this Hearing and emphasize the importance, if that's necessary, and my personal concern about the project. For four days and evenings the focus of the I–78 project will shift completely from Departmental Headquarters, in Trenton, to this school building in Berkeley Heights. Here it will be up to you, the people who live, work, and commute in this area, to state your case and to speak your mind on whether or not the Department should recommend the proposed completion of I–78 in Union and Somerset Counties, and if so, along which of the nine alternatives presently under consideration ....

As I'm here before you today, much prior to my communicating my recommended course of action to the Federal Highway Administration, I can honestly tell you that at this time the Department has not selected a preferred alternate, nor have I attempted to narrow the field of alternatives. However, the time for beginning the evaluation that will lead to making a full decision is close at hand. That process started once this week's Public Hearings is [sic] completed and a designated period for submitting written testimony is closed, cannot be effective or realistic unless in [sic] considers public input, along with the engineering, and environmental data presented here this evening. I am, therefore, urging you to take advantage of this week's public Hearing to present the type of constructive and well documented testimony that will permit me to make a recommendation that most effectively meets the needs of the public.

Admin. Record, doc. 176, App. at A112–13. Furthermore, an NJDOT press release, dated June 22, 1976, announced that "[t]he purpose of the hearing is to afford citizens the opportunity to participate in the process of determining whether a five-mile link of Route 78 in Union County should be constructed and if so, along which of the alignments under consideration." App. at A123.

**37.** Because the date of the location-approval request was so critical to appellants' case, appellants filed a Second Request for Production of Documents and sought discovery of documents constituting "requests for location approval" made in connection with other FHWA projects. App. at A278. Appellants' idea was "to ascertain ... what format or words were routinely used in other cases to request location approval," Brief for Appellants at 35, because "[appellants'] position throughout this case has been that location approval is requested by some kind of a document saying, in essence, 'we hereby request location approval,' " *id.,* and that requests for review or for approval to print do not suffice.

The court held a hearing on appellants' motion to compel production, App. at A303, and denied discovery, seeking "to limit the matter ... to the administrative record" and finding "no demonstration here that other projects ... have any bearing on the project that is here at issue." *Township of Springfield v. Goldschmidt,* No. 81–123 (D.N.J. Jan. 28, 1982) (Transcript of Proceedings), at 10, App. at A312. We cannot say that the court abused its discretion in restricting the scope of the proceedings to the administrative record. Moreover, our disposition of claim 2 renders any error in this regard unimportant.

op. at 16. In closing, the district judge wrote: "this court *finds* that in light of the Administrative Record and the applicable state and federal regulations, the 1959 location approval was never rescinded by FHWA and was preserved and 'grandfathered' by 23 C.F.R. § 771.4(b), 23 C.F.R. § 771.5(b) and the New Jersey Action Plan." *Id.* at 17 (emphasis added). Accordingly, the court denied appellants' motion for summary judgment on claim 2 and granted appellees' motion therefor. *Id.*

We begin our discussion by addressing what we consider to be a critical fallacy in appellants' argument: the contention that the 1959 location approval *must* either have lapsed or been rescinded because NJDOT otherwise would not have gone through the trouble of preparing an EIS, holding public hearings, cooperating with FHWA, etc. Regardless of the effectiveness *vel non* of the 1959 location approval, appellees had an *obligation* under NEPA, DOTA, and FAHA to compile an EIS and to hold the hearings; even assuming the continuing validity of the Bureau of Public Roads' 1959 actions, "[i]t is clear that projects in the design or pre-construction stage are subject to NEPA

[as well as to other environmental statutes]." *Concerned Citizens of Bushkill Township v. Costle,* 592 F.2d 164, 169 (3d Cir.1979).[38]

The I–78 project here at issue was nowhere near completion in 1976, when NJDOT held its location hearings. Design approval had not been requested; nor had design hearings even been scheduled.[39] There thus remained ample time and opportunity for appellees to conform the proposal to the requirements of NEPA, DOTA, and FAHA.[40] Accordingly, appellees had a duty to comply with those statutes, and their compliance thus can shed no light on the question whether the 1959 location approval remained in effect.[41]

■ Two possibilities remain: the 1959 location approval retains its validity unless (1) it was rescinded as a matter of fact or (2) it lost its meaning as a matter of law. The district court, after holding evidentiary hearings, found that FHWA never rescinded the 1959 approval. *See Springfield IV, supra,* slip op. at 17. We read this statement as a finding of fact, which we must accept unless we determine it to be clearly

---

**38.** *See also Louisiana Environmental Soc'y, Inc. v. Coleman, supra,* 537 F.2d at 87–89; *Pye v. Department of Transp. of Georgia,* 513 F.2d 290, 293 n. 3 (5th Cir.1975); *Lathan v. Brinegar, supra* note 6, 506 F.2d at 687–89; *Jones v. Lynn,* 477 F.2d 885, 888–90 (1st Cir.1973); *Arlington Coalition on Transp. v. Volpe, supra* note 4, 458 F.2d at 1330–39 (discussing "retroactivity" of NEPA, DOTA, and FAHA). In imposing the dictates of NEPA, DOTA, and FAHA on the I–78 project, we are not applying those statutes retroactively, for "[t]he question . . . . is not retroactivity; it is whether the statute[s] and regulation[s] apply to ongoing projects." *Louisiana Environmental Soc'y, Inc. v. Coleman, supra,* 537 F.2d at 88. Judge Van Dusen answered that question for this Court in *Concerned Citizens of Bushkill Township v. Costle, supra,* 592 F.2d at 169:

> The emphasis placed by Congress on the "continuing" obligation of Federal Government agencies to carry out the above policy and accomplish the environmental conditions prescribed in 42 U.S.C. § 4331(b) [and] 42 U.S.C. § 4332(C) [lead us to conclude that] only when an irreversible commitment of resources has already produced most of the environmental harm anticipated by an EIS does the reduced NEPA benefit allow the court to balance the marginal environmental

protection that would result against completion of the project.

**39.** According to the Brief for State Defendant-Appellees at 4, design hearings were to be held in July and August 1981, more than five years after the location hearings were held.

**40.** Our decision that NEPA, DOTA, and FAHA apply to the I–78 project does not conflict with our rulings in *Hopewell Township Citizens I–95 Comm. v. Volpe,* 482 F.2d 376, 379–80 (3d Cir. 1973); *Concerned Citizens of Marlboro v. Volpe,* 459 F.2d 332, 335 (3d Cir.1972); *Pennsylvania Envtl. Council, Inc. v. Bartlett, supra,* 454 F.2d at 624; and *Wildlife Preserves, Inc. v. Volpe,* 443 F.2d 1273, 1277 (3d Cir.1971). In each of those cases, construction had begun or plans had been finalized before the enactment of the environmental statutes at issue. Such was not the case with the I–78 project.

**41.** We also question whether actions and statements of individual state officials, *see supra* note 36, could rescind approval granted by the federal Government. We need not address this issue, however, for we decide the matter on other grounds, *see infra.*

erroneous.[42] This, we cannot do. The approval therefore must stand unless it lost its effect by operation of law; indeed, appellants conceded as much at oral argument.

We have held that NEPA, DOTA, and FAHA apply to the Watchung Gap project. Application of these statutes, however, does not *automatically* nullify every step taken prior to the enactment of those laws. Appellees did have a duty to comply fully with NEPA, DOTA and FAHA, but they were entitled to rely on the continuing validity of the 1959 location approval as long as (1) they did not alter the alignment of the highway from that approved in 1959 *and* (2) the federal authorities involved did not decide, on the basis of the EIS and the location hearings, that construction of the highway on the location previously approved would create unacceptable environmental impacts. It is clear from the record that (1) the preferred alignment proposed in the FEIS was virtually identical[43] to that approved by the Bureau of Public Roads in 1959 and that (2) FHWA ultimately approved construction of the highway according to those plans. The two conditions having been satisfied, NJDOT did not have to make a second request for approval to build the highway along the alignment for which location approval had been granted twenty years earlier. The 1959 request for location approval thus was "grandfathered," and NJDOT therefore cannot be faulted for not following the literal language of 23 C.F.R. § 790.5(e) and the Action Plan.[44]

Our reading of the Action Plan and of relevant federal regulations supports this conclusion. The Action Plan itself provides, at I–4, that "[t]he process described is not retroactive, and shall not apply to any step or steps taken in the development of a project prior to the time of FHWA approval." We also note that federal regulations prescribe specific procedures for projects "on which a hearing was held ... before January 18, 1969," but which "have not received location approval";[45] the absence of comparable regulations for projects on which a hearing was held and for which

---

**42.** *See Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972) (appellate court must accept factual determination made by district court "unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supporting evidentiary data").

**43.** It appears from the FEIS that the original 1959 alignment differed from the preferred 1976 alignment in only two respects: a 7,500-foot stretch of roadway at the eastern end of the gap was realigned slightly to the north, to move the highway "as far out of the wetlands as possible without severely encroaching on the Commonwealth Water Company Well Field or creating extreme excavations into the hillside north of Glenside Avenue," 2 FEIS at IV–A–1; the route also was realigned slightly to the south near the Sayre House "to minimize the impact on that historic property," *id.* at IV–A–2. *See also* 1 FEIS Exhibit S–4 and 4 FEIS Exhibits IX–P and –Q (maps showing various alignments). These changes are negligible and were effected to modify adverse environmental impacts. Furthermore, appellants do not appear to base their claim on the differences between the original (1959) and preferred (1976) alignments. Hence, we shall treat the alignment discussed in the FEIS as indistinguishable from that approved in 1959 by the Bureau of Public Roads.

**44.** *Cf.* 23 C.F.R. § 771.4(b) (1980) (provisions of section regulating EIS procedure "do not apply to or in any way affect or alter decisions, approvals, or authorizations which were given by the FHWA pursuant to directives then in effect"); *id.* at § 771.5(b) (development of EIS must be completed "prior to the selection of a particular location; except for those highway sections to which this part applies that had received location approval prior to the effective date of this part").

**45.** With respect to a project on which a hearing was held, or an opportunity for a hearing afforded, before January 18, 1969, the following requirements apply:

(1) With respect to projects which have *not* received location approval:

(i) If location approval is not requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the corridor hearing requirements is required unless a substantial amount of right-of-way has been acquired.

(ii) If location approval is requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the corridor hearing requirements is not required.

23 C.F.R. § 790.5(d) (1980) (emphasis added).

location approval *was* obtained prior to January 18, 1969, suggests that another formal request for such approval need not be made.

Accordingly, we will affirm the grant of summary judgment for appellees on claim 2.[46]

## VI. *Advance Acquisition of the Houdaille Quarry*

### A. *Introduction*

Appellees realized that construction of the highway would require the excavation and transportation of vast amounts of earth and rock. In 1979, NJDOT decided to acquire and use as a dump site the Houdaille Quarry, an inactive quarry in the Township of Springfield. No such acquisition had been mentioned in either the DEIS or the 1976 public hearings. Yet, appellees, relying on the same federal regulations invoked by appellants, *see infra,* elected to proceed without holding hearings or waiting for adoption of the FEIS and sought FHWA's approval of the acquisition in order to qualify for federal assistance. FHWA granted its conditional approval in June 1980. Letter from John J. Kessler, Jr., to Russell H. Mullen (June 26, 1980) (approving acquisition of Houdaille Quarry), App. at A150.

█ Claim 7 of appellants' complaint alleges that appellees approved and processed the advance acquisition of the quarry in violation of NEPA, DOTA, ERA, and, in particular, federal regulations providing that:

(1) In extraordinary cases or emergency situations the State highway department may request and [FHWA] may approve Federal participation in the acquisition of a particular parcel or a limited number of particular parcels within the limits of a proposed highway corridor prior to completion of processing of the [FEIS] or adoption of the negative declaration, but only after (i) the State highway department has given official notice

to the public that it has selected a particular location to be the preferred or recommended alignment for a proposed highway, or (ii) a public hearing has been held or an opportunity for such a hearing has been afforded. Proper documentation shall be submitted to show that the acquisition is in the public interest and is necessary to:

. . . .

(B) Prevent imminent development and increased costs of a parcel which would tend to limit the choice of highway alternatives.

. . . .

(4) Ultimate Federal participation in the cost of property acquired under § 712.204(d) is dependent upon the incorporation of such property in the final highway right-of-way. Where a parcel is partially incorporated, Federal participation will be in accordance with the alternative selected for statewide application pursuant to 23 C.F.R. § 710.304(m).

23 C.F.R. § 712.204(d)(1)–(4) (1980). Appellants claim that appellees neglected to investigate alternatives to acquiring the quarry, as required by NEPA and DOTA. They also claim that appellees violated section 712.204(d) in that: (1) NJDOT failed to give official public notice of site selection and neither held a public hearing nor provided an opportunity for one to be held; (2) development of the quarry was not imminent and acquisition costs would not rise; and (3) the quarry site was not intended to be incorporated in the final highway right-of-way. The district court granted summary judgment for appellees, finding that they had satisfied the dictates of 23 C.F.R. § 712.204(d) as well as the general NEPA requirement of considering alternatives to the proposed course of action. We agree that the mandate of NEPA has been satisfied, but we do not believe that appellants have demonstrated the requisite standing to prosecute their section 712.204(d) claim. Accordingly, we will affirm the grant of

---

46. We therefore do not reach the question whether NJDOT effectively requested location approval within three years of the 1976 public hearings. Without commenting on the validity

of the asserted substantial-compliance doctrine, however, we note that appellees certainly have complied substantially with the various statutes and regulations at issue.

summary judgment for appellees on claim 7.

### B.  Investigation of Alternatives

As the district court noted, it simply is incorrect to assert that appellees failed to consider alternatives to the taking of the quarry. *Springfield I, supra,* slip op. at 11. While the DEIS did not contain any mention of the plan, the FEIS did:

> Only two possible options are considered environmentally acceptable:
>
> 1.  haul all excess material to the inactive Houdaille Quarry, about one mile east of Baltusrol Road in Springfield;
>
> 2.  haul the estimated two million cubic yards of earth to Houdaille Quarry, and allow the contractor to sell the estimated one million cubic yards of rock to the active Fanwood Quarry about one mile south of the project on New Providence Road in the Township of Watchung.

2 FEIS at IV–A–28.[47]  Admittedly, the FEIS did not treat "the question of the lease as opposed to the purchase of the quarry," although leasing the quarry would have preserved the property's status as a tax ratable (a subject of concern to appellant Springfield Township).  The district court determined that this factor would not " 'significantly affect the quality of the human environment,' so as to trigger the application of the NEPA provisions.  [Citation omitted.]  Rather the consideration of the purchase as opposed to the lease of the quarry is economic, and does not come within the dictates of NEPA." *Springfield I, supra,* slip op. at 11.

We believe that the district court, in so holding, took too narrow a view of NEPA.  For NEPA to fulfill the vision of its drafters, the statute must encompass a broad spectrum of environmental and socio-economic changes that would affect the quality of life.  *See, e.g., Monarch Chemical Works, Inc. v. Thone,* 604 F.2d 1083, 1088 (8th Cir.1979) ("Changes in energy supply and demand occasioned by a federal project may be cognizable under the broad reach of NEPA."); *Nucleus of Chicago Homeowners Association v. Lynn,* 524 F.2d 225, 229 (7th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) (policy expressed in NEPA "necessarily includes concern for the quality of urban life"); *Hanly v. Mitchell,* 460 F.2d 640, 647 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) ("[NEPA] contains no exhaustive list of so-called 'environmental considerations,' but without question its aims extend beyond sewage and garbage and even beyond water and air pollution.").  Consistent with these views, we hold that NEPA's scope can comprehend a substantial adverse impact upon a municipal tax base.[48]

Nevertheless, we are unwilling to reverse the judgment of the district court on this basis.  Counsel for appellees informed us during oral argument that NJDOT has agreed to give to Union County $3,000,000, to improve the County's park system, and seventy acres of the Houdaille Quarry tract, contiguous to the Watchung Reservation, to serve as parkland.  Appellees also told us during oral argument that they intend to put up for auction the remaining ninety acres of the quarry tract after dumping has been completed; thus,

---

**47.**  "Under both options, the Houdaille Quarry would be graded to facilitate private development or recreational use by the State or County." *Id.* at IV–A–29.

**48.**  While the financial considerations involved in the cost of obtaining the use of the quarry by either purchase or lease might not seem of great importance in evaluating the total costs of constructing the highway, these considerations would appear to have substantial impact on a single township—in this case, the appellant Township of Springfield.  We are satisfied that, in this case, the financial impact was sufficiently serious to fall within the ambit of NEPA.  The Houdaille Quarry paid $83,832.64 in property taxes to Springfield in 1980, which amount represented almost one percent of the township's total tax levy.  *See* Letter from James R. Zazzali to Hon. Frederick B. Lacey (July 24, 1981) (containing document entitled "Filling of Houdaille Quarry"), App. at A469, A473.  We therefore are not dealing with a situation in which the lost tax ratable constitutes only a miniscule part of the municipal tax base.

improved and graded land may well return to Springfield's tax rolls. These actions will mitigate—and, indeed, might even outweigh—the adverse economic impacts stemming from the purchase of the Houdaille Quarry and its removal from the tax rolls. Given these facts, it would not have been unreasonable for appellees to have concluded that the decision to purchase rather than lease the quarry did not create a substantial economic impact; moreover, any failure expressly to consider and reject the leasing alternative was, on the facts of this case, at most harmless error.

### C. Advance-Acquisition Requirements

23 C.F.R. § 712.204(d) prescribes three requirements that a state must meet in order to obtain federal funds for the advance acquisition of land to be used in a highway construction project: (1) the state must show that advance acquisition is needed to "[p]revent imminent development and increased costs of a parcel which would tend to limit the choice of highway alternatives," id. at § 712.204(d)(1)(B); (2) the state must hold a public hearing on, or give notice to the public of, the planned acquisition, id. at § 712.204(d)(1); and (3) the state must incorporate the acquired land in the "final highway right-of-way," id. at § 712.-204(d)(4). The district court held that NJDOT had satisfied all three criteria, see Springfield I, supra, slip op. at 11–17; appellants contest the court's conclusion.

We do not reach the merits of appellants' section 712.204(d) argument, however, for appellants have failed to demonstrate the requisite standing to press this claim. Relying on Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 105 & n. 10 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970), appellants urged during oral argument that the Township of Springfield had standing to assert this claim because the advance acquisition of the Houdaille Quarry would deprive the township of a sizable tax ratable, see supra note 48. But this contention misses the mark.

Section 712.204(d) governs only those advance acquisitions actually made with federal funds; it does not regulate a purchase or condemnation effected by the state with its own monies. Thus, a finding that NJDOT and FHWA had violated section 712.204(d) would have meant only that NJDOT would have had to purchase the quarry with its own funds; it would not have meant that the quarry could not be purchased at all. Without deciding whether a plaintiff in Springfield's position ever can have standing to enjoin an alleged violation of section 712.204(d), we therefore hold that Springfield lacks standing to assert this claim unless it can show at least a nexus between the loss of tax revenues and the fact that federal, rather than state, funds were to be used to buy the Houdaille Quarry. The township has made no such showing on the record before us. There is no evidence that NJDOT would not have bought the quarry, or even would have delayed the acquisition, had federal monies been unavailable. The necessary nexus being lacking, appellants may not pursue their section 712.204(d) claim.[49] Accordingly, we

---

**49.** Appellants have asserted that NJDOT had no need to buy the land at all and that the agency could have followed the procedures established in N.J.Stat.Ann. §§ 27:7–66 and –67 (West 1982), whereby the state simply could file a map with the municipal clerk designating the proposed line of the highway. This map then would operate as a temporary stay on development of the site, giving NJDOT an opportunity to make recommendations as to any changes affecting that land. Because appellants' contention arguably might be construed as a pendent state claim against the advance acquisition separate from the § 712.204(d) claim, we note our agreement with the district court's conclusion that N.J.Stat.Ann. §§ 27:7–

66 and –67 do not foreclose NJDOT's actions. We do not read §§ 27:7–66 and –67 as giving NJDOT the absolute right to block development; to the extent that they might have that practical effect, however, these statutes appear to have been enacted in order to give the state the option of preserving a proposed site without having to buy it. There is no indication that §§ 27:7–66 and –67 were intended to preclude the state from actually purchasing the land. Cf. Kingston East Realty Co. v. State, By Comm'r of Transp., 133 N.J.Super. 234, 336 A.2d 40 (App.Div.1975) (reservation of land pursuant to statutory scheme neither constitutes a taking nor compels state to institute condemnation proceedings). NJDOT therefore

will affirm the grant of summary judgment for appellees on claim 7.

## VII. *Miscellaneous Claims*

We now dispose of appellants' remaining claims in a more summary fashion. In each instance, we will affirm the grant of summary judgment for appellees.

### A. *Fulfillment of Conditions*

When USDOT approved the FEIS, it did so on the condition that NJDOT work closely with the various communities affected by the I–78 project to develop plans for disposing of waste material, for grading and finishing the highway site, and for accommodating other community concerns.[50] Appellants allege in claim 6 that appellees—particularly NJDOT—have failed to meet US-DOT's conditions. Appellees have submitted letters purportedly showing the requisite compliance.[51]

The district court held:

That NJDOT has met with representatives of Berkeley Heights and Springfield is clear. These letters, in conjunction with the Administrative Record and the final EIS, show that NJDOT is striving to its utmost to comply with the USDOT conditions. I am convinced that the agency will continue to work closely with these communities as the project progresses in order that their concerns will be considered and resolved.

*Springfield II, supra,* slip op. at 19.

Appellants retort that the "breach of duty" claim does not depend on the administrative record and that proof should rest on affidavits, documents, and testimony of witnesses. Thus, they insist, the court erred in granting summary judgment. Moreover, they add, the record was not even complete until supplemented with the two letters written by NJDOT.

■ It is, of course, perfectly clear why those two letters did not earlier appear in the record: USDOT articulated the conditions on December 19, 1980, well after the FEIS had been printed and distributed; the letters were not written until May and July of 1981. Nor can appellants withstand summary judgment merely by asserting that appellees have breached their duty; instead, appellants must show the existence of a genuine issue of material fact as to the alleged noncompliance. As appellants have not presented any evidence showing noncompliance with the conditions, the district court properly granted summary judgment for appellees.

### B. *Alleged Violation of the Environmental Rights Act*

Appellants allege in claim 8 that the highway is being built in violation of section 2A:35A–4 of New Jersey's Environ-

---

was free to proceed by acquisition and without regard to §§ 27:7–66 and –67.

**50.** Memorandum from William B. Johnston to John S. Hassell, Jr. (Dec. 19, 1980) (conditionally approving FEIS), Admin. Record, doc. 406. The memorandum provided, in part:

[USDOT's] concurrence in the final EIS is based in part upon the following conditions which I believe are necessary to supplement the existing commitments by New Jersey DOT and to assure that adverse environmental and community impacts are minimized:

. . . .

3. NJDOT should be required to continue to work closely with Springfield and Berkeley Heights to continue to address the concerns of the local jurisdictions during the further planning and construction of the facility. In particular, NJDOT should attempt to resolve the issues raised in the Berkeley Heights re-

quest for a community impact analysis and the Springfield Township objections.

4. Potential adverse economic impacts of the highway should also be reviewed further in conjunction with Union County officials.

**51.** On May 21, 1981, Z. Wayne Johnson, of NJDOT, wrote to the Mayor of Berkeley Heights to thank him for having met with NJDOT officials on May 8, 1981, and to express NJDOT's desire "to open a continuous dialogue with Berkeley Heights to help us focus more clearly on your concerns about the project, and thereby, hopefully, resolve them if possible." Similarly, Johnson wrote on July 15, 1981, to the Mayor of Springfield Township to confirm plans for a meeting on July 23, 1981, to discuss "the I–78 project and its status." The letters are quoted in *Springfield II, supra,* slip op. at 19.

mental Rights Act ("ERA"), N.J.Stat.Ann. §§ 2A:35A–1 to –14 (West 1982), which grants a private right of action to any person seeking to enforce any statute or regulation designed to prevent or minimize pollution or destruction of the environment.[52] Subsection 2A:35A–4(b), however, allows such a suit "[e]xcept ... where the conduct complained of constitutes a violation of a statute, regulation or ordinance which establishes a more specific standard for the control of pollution, impairment or destruction of the environment...." *See supra* note 52.

The district court held that appellants could not sue under subsection 2A:35A–4(a) because they had "not set forth the statute, regulation or ordinance upon which they rely to maintain [their] cause of action ...." *Springfield II, supra,* slip op. at 20. The court also noted that subsection 2A:35A–4(b), by its terms, bars appellants' suit because there exists "a more specific standard for the control of pollution, impairment or destruction of the environment": the Action Plan. *See Borough of Kenilworth v. Department of Transportation,* 151 N.J.Super. 322, 335, 376 A.2d 1266, 1273 (App.Div.1977) (Action Plan applicable to proposed construction project constitutes "a more specific standard" within meaning of subsection 2A:35A–4(b)).

■ We agree that the Action Plan applies to this project and precludes appellants from maintaining a suit under subsection 2A:35A–4(b) of the ERA. We therefore affirm the grant of summary judgment for appellees on claim 8.

### C. *Removal of Project from Interstate System*

Finally, appellants allege in claim 9 that the I–78 project violates FAHA "in that the Project has been found to be non-essential, other conditions required for the Project to remain as part of the interstate system as set forth in FAHA have not been met, and the Project is required to be removed from designation as a part of the interstate system." Complaint at ¶ 62, App. at A28. Appellants rely on section 102(b) of FAHA of 1976,[53] which required USDOT to spend at least thirty percent of its 1978 and 1979 state apportionments to close "essential gaps" in the interstate system, as designated in USDOT's Interstate Gap Study. The Gap Study did not name the Watchung gap as an "essential gap," though it did so label another gap in I–78. Thus, appellants contend, federal expenditures for the Watchung site violated FAHA.

■ As the district court held, *Springfield II, supra,* slip op. at 21–22, this claim has no merit. FAHA does not decree that

**52.** Section 2A:35A–4 provides, in relevant part:

    a. Any person may maintain an action in a court of competent jurisdiction against any other person to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment.

    b. Except in those instances where the conduct complained of constitutes a violation of a statute, regulation or ordinance which establishes a more specific standard for the control of pollution, impairment or destruction of the environment, any person may maintain an action in any court of competent jurisdiction for declaratory and· equitable relief against any other person for the protection of the environment, or the interest of the public therein, from pollution, impairment or destruction.

**53.** At least 30 per centum of the apportionment made to each State for each of the fiscal years ending September 30, 1978, and

September 30, 1979, of the sums authorized in subsection (a) of this section shall be expended by such State for projects for the construction of intercity portions (including beltways) which will close essential gaps in the Interstate System and provide a continuous System.

    (2) The Secretary of Transportation shall report to Congress before October 1, 1976, on those intercity portions of the Interstate System the construction of which would be needed to close essential gaps in the System.

    (3) A State which does not have sufficient projects to meet the 30 per centum requirement of paragraph (1) of this subsection may, upon approval of the Secretary of Transportation, be exempt from the requirements of such paragraph to the extent of such inability.

Federal-Aid Highway Act of 1976, Pub.L. No. 94–280, § 102(b), 90 Stat. 425 (1976) (23 U.S.C. § 101 note (1976)).

only "essential gaps" may receive federal funding; rather, the statute merely accords to "essential gaps" priority over only thirty percent of the monies at issue. What US-DOT does with the remaining seventy percent is not determined by FAHA.

█ Appellants also assert that appellees failed to comply with 23 U.S.C. § 103(g) (1976),[54] which provides for removal from the interstate system of any segment for which a state has not presented by July 1, 1975, a "schedule for the expenditure of funds for completion of construction of such segment...." The district court found that NJDOT had submitted to FHWA the requisite schedules and accompanying information by letter dated June 13, 1975, thereby satisfying section 103(b) of FAHA. *Springfield II, supra,* slip op. at 23. We find no error in the court's ruling.

We will affirm in full the judgment of the district court.

---

**54.** Section 103(g) provides:

The Secretary, on July 1, 1974, shall remove from designation as a part of the Interstate System each segment of such system for which a State has not notified the Secretary that such State intends to construct such segment, and which the Secretary finds is not essential to completion of a unified and connected Interstate System. Any segment of the Interstate System, with respect to which a State has not submitted by July 1, 1975, a schedule for the expenditure of funds for completion of construction of such segment or alternative segment within the period of availability of funds authorized to be appropriated for completion of the Interstate System, and with respect to which the State has not provided the Secretary with assurances

satisfactory to him that such schedule will be met, shall be removed from designation as a part of the Interstate System. No segment of the Interstate System removed under the authority of the preceding sentence shall thereafter be designated as a part of the Interstate System except as the Secretary finds necessary in the interest of national defense or for other reasons of national interest. This subsection shall not be applicable to any segment of the Interstate System referred to in section 23(a) of the Federal-Aid Highway Act of 1968.